

# SEALED

**Office of the United States Attorney**
District of Nevada
333 Las Vegas Boulevard, Suite 5000
Las Vegas, Nevada 89101
(702) 388-6336

DANIEL G. BOGDEN
United States Attorney
WAYNE HETTENBACH
Senior Trial Attorney – United States Department of Justice
CRANE M. POMERANTZ
Assistant United States Attorney
Lloyd D. George United States Courthouse
333 Las Vegas Boulevard South, Suite 5000
Las Vegas, Nevada 89101
(702) 388-6336/Fax: (702) 388- 6418

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                    Plaintiff,<br><br>vs.<br><br>ALEXANDER JARIV,<br><br>                    Defendant. | CASE NO: 2:14-cr-0015-JCM-VCF<br><br>**CRIMINAL INFORMATION** |

The United States Attorney for the District of Nevada alleges that:

**COUNT ONE**
**Conspiracy**
**18 U.S.C. § 371**

### GENERAL ALLEGATIONS

1.      The defendant resides in or around Las Vegas, Nevada.

2.      The Energy Independence and Security Act of 2007 required the U.S. Environmental Protection Agency (EPA) and the U.S. Internal Revenue Service (IRS) to encourage the production and use of renewable fuel in the United States. Specifically, this Act directed these agencies to write regulations to ensure an increase in the amount of such fuel through a taxpayer-funded incentive program and a mandate that applied to petroleum refiners and importers.

3.      From May 2007 through the present, petroleum refiners and petroleum importers in the U.S. were required by federal law to have renewable fuel in their product mixes. These petroleum refiners and petroleum importers, who were known as "obligated parties," could meet this obligation by purchasing credits generated by renewable fuel producers or importers. The obligated parties were required to give these credits that they purchased to the EPA to meet their obligations under the law. These credits were called "renewable identification numbers" or "RINs." Since July 1, 2010, RIN credits were electronically generated, stored, and traded.

4.      Renewable fuel producers and importers could generate RIN credits by producing or importing renewable fuels, including biodiesel, produced by approved producers in compliance with EPA regulations. Then, the biodiesel producers or importers could sell the RIN credits to obligated parties or middlemen by selling a volume of biodiesel with a number of RIN credits tied to or "assigned" to that volume.

5.      Under EPA's regulations, there were circumstances that allowed a RIN credit owner to separate the RIN credit from the volume of biodiesel to which it had been assigned. After separation, RIN credits could be bought and sold without buying and selling the associated fuel. From then on, the RIN-stripped biodiesel could never be used to generate more RIN credits.

6.      Before July 1, 2010, businesses generating, buying and selling RINs would send required reports to the EPA about their RIN activity. After July 1, 2010, RIN transactions were handled through the EPA Moderated Transaction System (EMTS). In EMTS, all RIN generation events and all RIN transactions were recorded electronically, using an on-line database. Each RIN generation event was logged with a unique log identification number. Each RIN generating facility was assigned a unique production facility identification number.

7.      It was illegal to generate RINs for a volume of biodiesel that was not actually produced, or not produced in compliance with EPA regulations. In particular, it was illegal to

generate RINs unless the RINs were based on renewable fuel and the production process used to make that fuel met specific criteria. Moreover, it was illegal to generate RINs more than once for any given volume of biodiesel. It was also unlawful to fail to give RINs to EPA that one was obligated to give.

8. Producers and importers of biodiesel were required to report data to the EPA about the production process and the feedstock used and it was illegal to knowingly make material false statements in these electronic or paper submissions to the EPA.

## THE CHARGE

9. Beginning at a time unknown to the Grand Jury, but not later than in or about June 2009, and continuing thereafter until a time unknown to the Grand Jury, but not earlier than in or about January 1, 2012, in the District of Nevada and elsewhere, Defendant ALEX JARIV did knowingly and willfully combine, conspire, confederate, and agree with others known and unknown to the Grand Jury to commit offenses against the United States; specifically, he conspired to:

   a. transmit and cause to be transmitted by means of wire and radio communication in interstate and foreign commerce, writings, signs, signals, pictures and sounds for the purpose of executing a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations and promises, in violation of 18 U.S.C. § 1343;

   b. knowingly make false material statements, representations and certifications in, and to knowingly omit material information from, notices, applications, records, reports, plans and other documents required pursuant to the Clean Air Act, in violation of 42 U.S.C. § 7413(c)(2)(A); and

   c. knowingly conduct and attempt to conduct financial transactions affecting interstate commerce and foreign commerce, which transactions involved the proceeds of

specified unlawful activity, that is, wire fraud, knowing that the transactions were designed in whole or in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity, and that while conducting and attempting to conduct such financial transactions, knew that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, in violation of Title 18, U.S.C. Section 1956(a)(1)(B)(i)

**Manner and Means**

10. The defendant, with others, operated Canada Feedstock Supply in Vancouver, British Columbia, Canada. Canada Feedstock would falsely claim to import into Canada from the United States agricultural oils and grease, a feedstock for biodiesel, and would falsely claim to sell and transfer this product to a closely affiliated company owned by the defendant's father and other coconspirators, called CityFarm, also in Vancouver, British Columbia. CityFarm would claim to produce biodiesel and then import it into the United States, and sell the biodiesel to another related company, Global E Marketing, located in Las Vegas, Nevada, and controlled and operated by the defendant's coconspirator father. CityFarm would in actuality not produce the quantities of biodiesel that it claimed to import and sell to Global E Marketing. The employees and agents of CityFarm and Global E Marketing, with the defendant's knowledge, would generate documents such as import records, invoices, and shipping records to document the import and sale of biodiesel from CityFarm to Global E Marketing, when in truth and in fact the quantities of biodiesel claimed to be generated and sold were false.

11. The defendant, and others at his direction, would make entries in an EPA computer system that falsely claimed that CityFarm had produced biodiesel, and imported, transferred and sold it to Global E Marketing. The defendant, and others at his direction, would make additional entries in this EPA computer system that claimed this biodiesel was blended with petroleum diesel,

when in truth and in fact it was not. These entries in the EPA computer system allowed Global E Marketing to create a credit, called a RIN, that could be sold for money.

12. The defendant and his coconspirators caused Global E Marketing to generate in excess of 6.2 million RINs, worth between $7 and $20 million, for fuel that was never produced, imported, and sold to Global E Marketing as entered in the EPA computer system.

13. The defendant, his coconspirators, and Global E Marketing then sold and transferred these RINs to customers in exchange for money. The defendant, and others at his direction, would make entries in an EPA computer system documenting these sales.

14. Monies from the sales of the fraudulently generated RINs would be deposited in bank accounts in Las Vegas, Nevada. Monies from the sales of the fraudulently generated RINs would be transferred between banks in Nevada and elsewhere in an attempt to disguise the origin of the funds, and to protect the funds from seizure by the government.

## Overt Acts

15. In furtherance of the conspiracy, and to accomplish the objectives of the conspiracy, the Defendant and others did commit the following overt acts, among others, in the District of Nevada, and elsewhere:

**Overt Act 1.** The defendant traveled to Vancouver, British Columbia, for the purpose of operating the company Canada Feedstock Supply in Canada. The company was created and operated for the purpose of creating records that would make it appear as if CityFarm was purchasing agricultural oils and grease needed for biodiesel production.

**Overt Act 2.** In 2009, a biodiesel producing facility in Vancouver, British Columbia, called CityFarm was purchased by the defendant's coconspirators.

**Overt Act 3.** In 2009, the company Global E Marketing was formed in Las Vegas, Nevada, for the purpose of claiming to import biodiesel and sell RINs. Global E Marketing was owned and operated by the defendant's coconspirators.

**Overt Act 4.** Between August 25, 2010 and October 25, 2011, on approximately 240 occasions, each occasion constituting an overt act, Alex Jariv or others at his direction made entries in the EPA EMTS computer system claiming that Global E Marketing had imported and purchased biodiesel produced by CityFarm in Canada.

**Overt Act 5.** Between August 25, 2010, and October 25, 2011, on approximately 76 occasions, each occasion constituting an overt act, Alex Jariv or others at his direction made entries in the EPA EMTS computer system claiming that Global E Marketing had blended biodiesel it had claimed to import and purchase with petroleum diesel. This allowed Global E Marketing to separate the RIN from the volume of biodiesel it had claimed to import and purchase.

**Overt Act 6.** Between August 25, 2010, and October 25, 2011, on approximately 62 occasions, each occasion constituting an overt act, Global E Marketing sold and transferred fraudulent RINs to third party purchasers. The purchasers paid for the RINs by wire transfer as directed by the defendant to accounts in Las Vegas, Nevada, from Kansas, New York, and elsewhere.

All in violation of United States Code Title 18 Section 371.

### FORFEITURE

16.     The allegations of Count 1 of this Information are realleged and by this reference fully incorporated herein for the purpose of alleging forfeitures to the United States of America pursuant to the provisions of Title 18, United States Code, Section 982(a)(1), Title 18, United States Code, Section 981(a)(1), and Title 28, United States Code, Section 2461(c).

17. Pursuant to Title 18, United States Code, Section 982(a)(1), upon conviction of an offense in violation of Title 18, United States Code, Section 1956, or a conspiracy related thereto, as set forth in Count 1 of this Information, the Defendant shall forfeit to the United States of America any and all property, real or personal, involved in such offense and any property traceable to such property. The property to be forfeited includes, but is not limited to, the following:

  a. Cash in the amount of $42,000;
  b. 2007 Hummer H2, bearing Nevada tag 953 YZT, VIN 5GRGN23U77H100987;
  c. Real property located at 322 Karen Avenue, #1801, Las Vegas, NV, Clark County parcel number 162-10-114-121, including all structures, appurtenances, and improvements thereon;
  d. Contents of Bank of Montreal Account No. 3970448;
  e. Contents of Bank of Montreal Account No. 4781218;
  f. Contents of American First Credit Union Account No. 27844083-1; and
  g. Contents of any other foreign or domestic bank account involved in the offense and any property traceable to such property.

18. Pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), upon conviction of an offense or offenses in violation of Title 18, United States Code, Section 1343, or a conspiracy related thereto, as set forth in Count 1 of this Information, the Defendant shall forfeit to the United States of America, any and all property, real or personal, which constitutes or is derived from proceeds traceable to the offense or offenses. The property to be forfeited includes, but is not limited to, the following:

  h. Cash in the amount of $42,000;
  i. 2007 Hummer H2, bearing Nevada tag 953 YZT, VIN 5GRGN23U77H100987;
  j. Real property located at 322 Karen Avenue, #1801, Las Vegas, NV, Clark County parcel number 162-10-114-121, including all structures, appurtenances, and improvements thereon;
  k. Contents of Bank of Montreal Account No. 3970448;
  l. Contents of Bank of Montreal Account No. 4781218;
  m. Contents of American First Credit Union Account No. 27844083-1; and
  n. Contents of any other foreign or domestic bank account which constitutes or is derived from proceeds traceable to the offense or offenses.

19. If the property described above as being subject to forfeiture, as a result of any act or omission of the Defendant,

    a. cannot be located upon the exercise of due diligence;

    b. has been transferred or sold to, or deposited with a third person;

    c. has been placed beyond the jurisdiction of the Court;

    d. has been substantially diminished in value; or

    e. has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1), and Title 31, United States Code, Section 5317(c), and Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of the Defendant up to the value of the above forfeitable property and obtain a money judgment in an amount equal to the value of the property involved in the violations.

Dated this 2nd day of January 2014

DANIEL G. BOGDEN,
United States Attorney

_____
WAYNE D. HETTENBACH
Senior Trial Attorney
CRANE M. POMERANTZ
Assistant United States Attorney